UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ODE A. OBATAIYE, | Civil Action No. 14-5462 (FLW) |
| Plaintiff, | |
| V. | OPINION |
| GARY LANIGAN, et al., | |
| Defendants. | |

## I.     INTRODUCTION

Plaintiff's Second Amended Complaint alleges violations of 42 U.S.C. § 1983 and the

New Jersey Civil Rights Act (NJCRA) arising out of his six-and-a-half year confinement in the

Management Control Unit (MCU) at New Jersey State Prison (NJSP).  New Jersey Department

of Corrections Defendants Gary Lanigan, Charles E. Warren, Jimmy Barnes, and Michelle Ricci

have moved to dismiss the Second Amended Complaint on a number of grounds.  For the

reasons stated in this Opinion, the Court will grant the motion to dismiss as to the Moving

Defendants and will provide Plaintiff with 30 days in which to submit a Third Amended

Complaint with respect to the claims that the Court has dismissed without prejudice.

## II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### a.  Factual Background

The Court recounts the relevant facts as stated in Plaintiff's Second Amended Complaint.

Plaintiff alleges that on May 21, 2006, he and his brother were involved in an altercation with

correctional staff at McDougal Correctional Facility in Connecticut, where he was serving a

sentence.  (ECF No. 23, Second Am. Compl. at ¶ 16.)  As a result of the incident, Plaintiff and

his brother were charged with and convicted of assault, and each received a three year sentence

1

that ran consecutively with their current sentences.  (*Id.* at ¶ 17.)  According to the Second Amended Complaint, Plaintiff and his brother were also placed in administrative segregation in Connecticut as a result of the assault; Plaintiff spend 19 months in administrative segregation and completed a one-year administrative segregation program, which was a prerequisite to being placed back in the general population in Connecticut.  (*Id.* at ¶18-19.)

After completion of the administrative segregation program, Plaintiff and his brother were both transferred out of state.  (*Id.* at ¶ 20.)  Plaintiff's brother was transferred to a facility in Rhode Island, where he was allegedly placed in the general population.  (*Id.* at ¶ 21.)  On January 17, 2008, Plaintiff was transferred to NJSP and was "immediately placed in pre-hearing Management Control Unit, which is [a] 24-hour lockin[,]" where he allegedly remained for six-and-a-half years.  (*Id.* at ¶¶ 22.)  Plaintiff alleges that his placement in the MCU was not court ordered or a condition of his transfer, as he had already served 19 months in administrative segregation in Connecticut and had completed the one-year administrative segregation program. (*Id.* at ¶ 23.)  Plaintiff further alleges that prior to his transfer, prison officials in Connecticut told Plaintiff and his brother that they would be placed back in the general population upon successful completion of the one-year program.  (*Id.* at ¶ 24.)  Plaintiff's Amended Complaint also alleges that he fulfilled the requirement of the one-year administrative segregation program and had not received any disciplinary charges since the assault on May 21, 2006.  (*Id.* at ¶ 25.)

Plaintiff has sued New Jersey Corrections Defendants Gary Lanigan, Charles E. Warren, Jimmy Barnes, Michelle Ricci, and Dr. Flora DeFilippo, as well as unidentified John and Jane Doe Corrections Officials from the Connecticut Department of Corrections, for violations of his civil rights under Section 1983 and the NJCRA arising from his more than six year confinement in the MCU.

Defendant Lanigan is identified in the Second Amended Complaint as the

> Commissioner of [the] New Jersey Department of Corrections
> [NJDOC,] who at all time relevant mentioned herein, is employed
> as a correctional official and, charged with the day to day operation
> of [NJDOC] and its employees and, [is] responsible for training,
> maintaining, supervising and disciplin[ing] of [NJDOC] employees
> and responsible for enforcement of [NJDOC] policies and practices
> of [NJDOC] employees.

(Second Am. Compl. at ¶ 11.)  Defendant Warren is identified in the Second Amended

Complaint as "the former Administrator of NJSP" who "was charged with the day to day

operations of [NJSP] and its correctional employees, policy and practices and, enforcement of

prison day to day operations."  (*Id.* at ¶ 12.)  According to Plaintiff, Defendant Ricci was, during

the relevant time periods,

> Director of Operations, and Former Administrator of [NJSP,]"
> [who was] "responsible for overseeing, maintaining, enforcing and
> enacting policies[,] customs[,] and practices governing the [MCU]
> . . . . Such duties included . . . assignment of professional services
> and custody staff to act as members of the [M.C.U Review
> Committee] as well as reviewing appeals filed by prisoners to the
> MCU unit.

(*Id.* at ¶ 13.)  Defendant Barnes was, during the relevant time periods,

> the former chair and hearing officer of the [MCU] Unit Review
> Committee and hearing officer of the MCU Unit Review
> Committee[,] [who was] "responsible for overseeing, operating,
> [and] maintaining [the] MCU Unit Review Hearing and[]
> implementing its polic[ies] and customs [and was also] a voting
> member of the MCU review committee either in person or by his
> designee.

(*Id.* at ¶ 14.)

### 1.   Alleged Conspiracy to Punish Plaintiff by Confining him in the MCU

In Count I of the Second Amended Complaint, Plaintiff alleges that Moving Defendants

Lanigan, Warren, Ricci, and Barnes, along with non-moving Defendant Dr. Flora DeFilippo,

conspired with John and Jane Doe prison officials in Connecticut to confine Plaintiff in the MCU

as additional punishment for the "Connecticut incident," which is presumably the May 21, 2006

assault.  (*Id.* at 26-40 ("Count II").)  To support the alleged conspiracy, Plaintiff alleges that he

did not receive written notice within 24 hours of placement in the MCU and was not accorded a

timely hearing within 10 days of his placement in the MCU.  Instead, 40 days after his

confinement in the MCU, Plaintiff received a notice informing him that a classification hearing

would be held on March, 10, 2008.  After that hearing before the MCU Review Committee

("MCURC"), Plaintiff was ordered to the MCU "without just cause."[1]  (*Id.* at ¶ 32.)  Plaintiff

further states that these Defendants had no basis on which to confine Plaintiff in the MCU for

over six years "other than to commit overt acts of conspiracy an additional

punishment/retaliation for the Connecticut incident." (*Id.* at ¶ 38.)

### 2.  Alleged Policy of Conducting Sham Review Hearings

In Count II of the Second Amended Complaint, Plaintiff alleges that

> [i]t was the policy of the Defendants[] Lanigan. Ricci, Warren,
> Barnes and[,] DeFilippo, and the John Doe/Jane Doe . . .
> Connecticut Defendants to conduct sham MCU Review Hearings
> to substantiate [the] illegal lock in of Plaintiff in [the] MCU All
> documentation as to why he was subject to unlawful, illegal
> detention in [the] MCU referenced the May 2006 incident that
> Plaintiff had already completed such administrative segregation
> program while he was in Connecticut.  Plaintiff had not violated
> any rules or regulations in the State of New Jersey Department of
> Corrections wherein he was locked in a cell at a minimum 24 hours
> a day with the exception of recreation days which occurred once
> every four days.

(*Id.* at ¶¶ 42-43.)   Plaintiff additionally alleges that since his "placement in the MCU[,] the

Review Committee . . . conducted seventeen (17) routine reviews held every three months[,]

---

[1] Count I also reiterates the earlier allegations that Plaintiff had already been punished for the
May 21, 2006 assault and had received a three-year consecutive term and serving 19 months in
administrative segregation in Connecticut; he also maintains that his placement in the MCU was
contrary to the promise made by Connecticut officials to place him back in the general
population after he completed the one-year program.  (*Id.* at ¶¶ 33-34.)

4

and[] six annual reviews held once a year[,]" and did not release Plaintiff from the MCU despite the fact that he committed no violations during that period. (*Id.* at ¶ 45.)  Plaintiff describes the hearings allegedly conducted by all Defendants as "sham and perfunctory," but provides no facts about the hearings themselves.  (*Id.*)

### 3.   Alleged Unsafe and Unsanitary Conditions in the MCU

In Count III of the Second Amended Complaint, Plaintiff alleges that the Moving Defendants Lanigan, Ricci, Warren, Barnes, non-moving Defendant DeFilippo, as well as the John and Jane Doe Connecticut Prison Officials, violated his Eighth Amendment rights by subjecting him to "unsafe [and] unsanitary" prison conditions in the MCU for over six years. (*Id.* at ¶ 48.)

After his placement in the MCU, Plaintiff was allegedly stripped of his clothing and shoestrings and placed on close observation/suicide watch, and a corrections officer was placed in front of his cell 24 hours a day and watched Plaintiff as he used the bathroom.  (*Id.* at ¶ 51.) Plaintiff alleges that this treatment was humiliating and unwarranted because Plaintiff did not have a mental illness; the treatment caused prisoners and corrections officers "to stigmatize Plaintiff as a 'special needs' prisoner, *i.e.*, as being unstable or a 'nut.'"[2] (*Id.* at ¶ 51.)  Plaintiff also alleges that the toilet in his cell had "'months' of feces build up to such a degree that the toilet would not flush."  Plaintiff alleges that he complained about the problem but was not given cleaning supplies because he was not allowed to use cleaning supplies due to his "prehearing

---

[2] Later in the Second Amended Complaint, however, Plaintiff alleges that he has developed mental issues such as talking to himself and making uncontrollable outburst[s] of random noises" due to his confinement in the MCU.

watch close observation status." (*Id.* at ¶ 52.)  Plaintiff does not allege that he made any

complaints regarding these issues to any of the Moving Defendants.

Plaintiff was also allegedly "subjected to extremely cold temperatures during that time

without proper clothing, blankets[,] and[] bedding.  For several weeks he had one pair of

oversized boxer shorts, no socks, one khaki shirt[,] and[] pants." (*Id.* at ¶ 53.)  The Second

Amended Complaint further alleges that during the winter months, the vent was blowing cold air

and the cell was freezing.  Plaintiff allegedly filed grievances concerning the cold temperatures

with some going unanswered.   Although the cold temperatures were allegedly an "ongoing

issue, the Defendants failed to remedy the wrong by correcting the freezing cold and/or

providing blankets." (*Id.* at ¶ 56.)   Plaintiff also complains that there were "extreme heat

conditions" during the summer months.  (*Id*. at ¶ 58.)  Plaintiff describes the temperatures issues

in the MCU as "a long historical documented MCU issue."  (*Id.* at ¶ 58.) As a result of the cold

temperatures in the MCU, Plaintiff allegedly suffers from severe and chronic aching in his

muscles and bones.  The extremely hot conditions over the six-and-a-half year period have also

allegedly caused Plaintiff to suffer from severe headaches, difficulty breathing, extreme

exhaustion, and a "constantly dried and bloody nose."  (*Id.* at ¶¶ 58-59.)  Finally, Plaintiff claims

that  his exposure to extreme cold and heat has caused him to be placed on "chronic care" status

and to be placed on blood pressure medication for hypertension, which he did not have prior to

his placement in the MCU.  (*Id.* at ¶¶ 60-61.)

Moreover, Plaintiff alleges that "[he] was placed in a cell block [in the MCU] where

special needs prisoners were banging on the cells all day and night or screaming out loudly[.]"

(*Id.* at ¶ 62.)  These prisoners allegedly "yelled all night, banged or yelled in unison for hours,

and [at] all hours of the night."  (*Id.* at ¶ 63.)  Such banging and screaming allegedly caused

Plaintiff to suffer from sleep deprivation and to seek psychiatric help and medication.  (*Id.*)  This "exposure" to special needs prisoners allegedly caused Plaintiff to be placed on chronic care because he was "stressed out[.]"  (*Id.* at ¶ 62.)  Plaintiff further complaints that these prisoners refused to wash, which created unsanitary common areas that are shared by all MCU prisoners.  The unsanitary conditions allegedly led to an infestation of mice in Plaintiff's cell, and the mice apparently ate through Plaintiff's personal property and his food.  (*Id.* at 65.)  Finally, Plaintiff alleges as follows:  "Defendants were in fact notified of these risks and[] the injuries Plaintiff has already suffered due to this ongoing confinement."  (*Id.* at ¶ 68.)

### 4.  Facts relating to Defendants' Knowledge of the Alleged Constitutional Violations

Count IV of the Second Amended Complaint reiterates many of the allegations in the earlier Counts and also attempts to plead facts to establish that all of the Defendants knew that Plaintiff was wrongfully confined in the MCU.  In that regard, Plaintiff alleges that Defendants Lanigan, Ricci, Warren, Barnes, Dr. DeFilippo, and the John and Jane Doe Connecticut corrections officers

> knew what they were doing by virtue of the every six month progress report transmitted between the two prison systems concerning the Plaintiff.  This progress report continue[d] for the duration of Plaintiff[']s confinement in the New Jersey State Prison System.  This ongoing conspiracy establishes that there were overt acts committed to confine Plaintiff in the MCU even after he had completed 19 months of administrative segregation in Connecticut.

(*Id.* at ¶ 70.)  Allegedly, "[a]ll Defendants named [in the Second Amended Complaint] had personal knowledge of Plaintiff[,] and personal involvement and acted with deliberate indifference knowing very well that there is a substantial risk that Plaintiff would be harmed." (*Id.* at ¶ 74.)  It is Plaintiff's position that "Defendants continued to perpetrate the wrongs and we[r]e well aware of what they we[r]e doing by way of the remedy system and[] the normal

7

source of information which is the progress reports transmitted between the two prison systems supervisory officials." (*Id.* at ¶ 78.)  Plaintiff alleges that "[a]ll Defendants named herein the Second Amended Complaint were personally involved in violations of Plaintiff[']s constitutional rights and is [sic] individually liable." (*Id.* at ¶ 80.)  Finally, Count IV specifies that Plaintiff is suing the Defendants in their individual and official capacities.  (*Id.* at ¶ 81.)

### b.  Procedural History

This case was initially removed on July 16, 2013, and docketed as Civ. Action No. 13-4323, *Obataiye v. Lanigan, et al.*  After Defendants removed that case to federal court, Plaintiff filed a motion objecting to the removal (Civ. Act. No. 13-4323, ECF No. 11), and, after Defendants filed a motion to dismiss (*id.* at ECF No. 20), Plaintiff sought to amend his Complaint to delete his federal claims and remand the case to state court.  (*Id.* at ECF No 20, 21).  Defendants subsequently filed a letter with this Court consenting to that amendment and to Plaintiff's request for remand. (*Id.* at ECF No. 22.)  The Court granted Plaintiff's motion to amend, and, in light of the absence of federal claims, directed the Clerk's office to file the Amended Complaint in Civil Action No. 13-4323 and remand the case to the Superior Court of New Jersey, Mercer County, Law Division.  (*Id.* at ECF No. 23.)

Apparently, after this Court remanded the case to the state court, Plaintiff filed a different Amended Complaint there that reasserted his voluntarily dismissed federal claims. (*See* ECF No. 14-1, Amended Complaint dated August 5, 2014.)   In response, Defendants Lanigan and Ricci removed the case once again on the basis of the Amended Complaint, and the instant proceeding was docketed as *Obataiye v. Lanigan, et al.*, 14-5462.  (*See* ECF No. 1.)  Defendants Lanigan, Warren, Ricci, and Barnes then moved to dismiss the Complaint.  (ECF No. 14.)  Fourteen days later, Plaintiff filed a motion for leave to file a second amended complaint.  (ECF No. 15.)  In

response, the Moving Defendants conceded that Plaintiff had amended his Complaint as of right pursuant to Rule 15.  (*See* ECF No. 20.)  On December 15, 2015, the Court ordered the Clerk to file Plaintiff's Second Amended Complaint and denied without prejudice the Moving Defendants' motion to dismiss the Amended Complaint.  The Court permitted the Moving Defendants to file a new motion to dismiss within 30 days.  (ECF Nos. 22-23.)

The Moving Defendants subsequently sought an extension of time within which to file their motion to dismiss directed at the Second Amended Complaint, which the Court granted.  (ECF Nos. 24-26.)  On February 12, 2016, the Moving Defendants filed their motion to dismiss the Second Amended Complaint.  The motion included a certificate of service indicating that it had been served on Plaintiff at EJSP.  Plaintiff, however, has not filed any opposition to the motion.  More than six months has passed without a response from Plaintiff.

## III.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a claim "for failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  On a motion to dismiss for failure to state a claim, the moving party "bears the burden of showing that no claim has been presented."  *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)); *United Van Lines, LLC v. Lohr Printing, Inc.*, No. CIV. 11–4761, 2012 WL 1072248, at *2 (D.N.J. Mar. 29, 2012).  In considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff.  *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005).  It is well settled that a pleading is sufficient if it contains "a

short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

In ruling on a motion to dismiss, Courts are required to liberally construe pleadings drafted by *pro se* parties. *See Tucker v. Hewlett Packard, Inc.*, No. 14-4699 (RBK/KMW), 2015 WL 6560645, at *2 (D.N.J. Oct. 29, 2015) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). Such pleadings are "held to less strict standards than formal pleadings drafted by lawyers." *Id.* Nevertheless, pro se litigants must still allege facts, which if taken as true, will suggest the required elements of any claim that is asserted. *Id.* (citing *Mala v. Crown Bay Marina*, Inc., 704 F.3d 239, 245 (3d Cir. 2013)). To do so, [a plaintiff] must plead enough facts, accepted as true, to plausibly suggest entitlement to relief." *Gibney v. Fitzgibbon*, 547 F. App'x 111, 113 (3d Cir. 2013) (citing *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012)). Liberal construction also does not require the Court to credit a *pro se* plaintiff's "bald assertions" or "legal conclusions." *Id.* (citing *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)). That is, "[e]ven a *pro se* complaint may be dismissed for failure to state a claim if the allegations set forth by the plaintiff cannot be construed as supplying facts to support a claim entitling the plaintiff to relief. *Id.* (citing *Milhouse v. Carlson*, 652 F.2d 371, 373 (3d Cir. 1981)).

## IV.   ANALYSIS

### a.  Official Capacity Claims

The Moving Defendants first argue that Plaintiff's § 1983 and NJCRA claims[3] against them in their official capacities must be dismissed because they are not persons within the

---

[3] To the extent that Plaintiff raises NJCRA claims mirroring his § 1983 claims, those claims will be addressed in tandem with his federal causes of action. *See Trafton v. City of Woodbury*, 799 F.Supp.2d 417, 443–44 (D.N.J.2011); see also Chapman v. New Jersey, No. 08–4130, 2009 U.S. Dist. LEXIS 75720, at *7, 2009 WL 2634888 (D.N.J. Aug. 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart...."); *Armstrong v.*

meanings of those statutes. The Court will dismiss with prejudice the official capacity claims for damages against the Moving Defendants, who are state employees, because these claims are essentially damages claims against the state. And the state is not a "person" subject to suit under § 1983 or the NJCRA. *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 68-70 (1989) (holding that States and governmental entities considered "arms of the State" for Eleventh Amendment purposes are not "persons" within the meaning of § 1983); *Hafer v. Melo*, 502 U.S. 21, 27 (1991) ("State officers sued for damages in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the government that employs them."); *Didiano v. Balicki*, 448 F. App'x 634, 639 (3d Cir. 2012) (finding in relevant part that the NJCRA does not provide a cause of action against state officials in their official capacities); *Baals v. State*, No. A-3714-12T2, 2014 WL 2131668, at *2 (N.J. Super. Ct. App. Div. May 23, 2014) (finding that state is not a person under the NJCRA), *certif. denied*, *Baals v. State*, 220 N.J. 208 (2015).

The Court notes that Plaintiff's Second Amended Complaint also appears to seek a declaration that the Moving Defendants violated his constitutional rights in connection with his confinement in the MCU. (*See* Second Am. Compl. at page 19.) A plaintiff may sue state officials in their official capacities if the plaintiff is seeking prospective relief, such as an injunction. *See Ex parte Young*, 209 U.S. 123, 155-56 (1908). However, a declaratory judgment is inappropriate solely to adjudicate past conduct. *Rush v. Wiseman*, No. CIVA 09-4385, 2010 WL 1705299, at *11 (E.D. Pa. Apr. 27, 2010) (citing *Gruntal & Co., Inc., v. Steinberg*, 837 F. Supp. 85, 89 (D.N.J. 1993). Nor is declaratory judgment meant simply to proclaim that one

---

*Sherman*, No. 09–716, 2010 U.S. Dist. LEXIS 55616, at *15, 2010 WL 2483911 (D.N.J. Jun. 4, 2010) ("[T]he New Jersey Civil Rights Act is a kind of analog to section 1983 ....").

party is liable to another. *Corliss v. O'Brien*, 200 F. App'x 80, 84–85 (3d Cir. 2006) (citing

*Lovelaies Harbor, Inc. v. United States*, 27 F.3d 1545, 1553–54 (Fed. Cir.1994) (*en banc*)

(concluding that the plaintiff's prayer for a "declaration" of a regulatory taking was "different

from a formal declaration under the Declaratory Judgement Act.").  As such, the Third Circuit

has denied the request for declaratory relief where the litigant "is not seeking declaratory relief in

the true legal sense." *Corliss*, 200 F. App'x at 84-85.  Because Plaintiff's Second Amended

Complaint seeks declaratory relief solely to adjudicate past conduct, the Court will also dismiss

without prejudice the official capacity claims for injunctive relief under § 1983 and the NJCRA

as to the Moving Defendants.

> **b. Conspiracy Claim**

The Court likewise dismisses without prejudice Plaintiff's conspiracy claim under § 1983

and the NJCRA as to each of the Moving Defendants.  Civil rights conspiracies brought under

Section 1983 and the NJCRA require a "meeting of the minds," and to survive a motion to

dismiss, a plaintiff must provide some factual basis to support the existence of the elements of a

conspiracy, namely, agreement and concerted action.  *See Startzell v. City of Philadelphia*, 533

F.3d 183, 205 (3d Cir. 2008) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970));

*Capogrosso v. Supreme Court of New Jersey*, 588 F.3d 180, 184 (3d Cir. 2009). "[A] plaintiff

must assert facts from which a conspiratorial agreement can be inferred." *Great W. Mining &*

*Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010). In other words, there must

be a "meeting of the minds." *See Startzell*, 533 F.3d at 205.  "[T]he bare allegation of an

agreement is insufficient to sustain a conspiracy claim." *Brown v. Deparlos*, 492 F. App'x 211,

215 (3d Cir. 2012) (per curiam) (citing *Abbott v. Latshaw*, 164 F.3d 141, 148 (3d Cir. 1998)); *see*

*also Young v. Kann*, 926 F.2d 1396, 1405 n. 16 (3d Cir. 1991) (affirming the dismissal of

"conspiracy claims [that] do not appear to be based in fact, but merely upon ... own suspicion and speculation").  It is also insufficient to allege that "the end result of the parties' independent conduct caused plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism."  *Novellino v. N.J. Dep't of Corr. Mountainview Youth*, 2011 U.S. Dist. LEXIS 85209, 2011 WL 3418201 (D.N.J. Aug. 3, 2011), *15 (citing *Spencer v. Steinman*, 968 F. Supp. 1011, 1020 (E.D. Pa. 1997)).

In Count I, Plaintiff alleges that Moving Defendants Lanigan, Warren, Ricci, and Barnes, along with non-moving Defendant Dr. Flora DeFilippo, conspired with John and Jane Doe prison officials in Connecticut to confine Plaintiff in the MCU at NJSP as additional punishment relating to the May 21, 2006 assault.   (Second Am. Compl. at 26-40 ("Count II").)  To support his allegations of conspiracy, Plaintiff alleges that he was confined in the MCU upon arrival at NJSP, did not receive the proper paperwork or a timely hearing regarding his placement there, and was ordered to the MCU by the MCURC "without just cause." (*Id.* at ¶ 32.)  He further alleges that he had already been punished for the May 21, 2006 assault, and Connecticut officials had promised he would be placed back in the general population after he completed the one-year administrative segregation program in Connecticut.  (*Id.* at ¶¶ 33-34.) These facts, however, do not suggest that any of the Moving Defendants reached an agreement with each other, Dr. Flora DeFilippo, and/or the unidentified Connecticut officials to wrongfully confine Plaintiff in the MCU.  Although the Second Amended Complaint states in a conclusory fashion that the Defendants had no basis on which to confine Plaintiff in the MCU for over six years "other than to commit overt acts of conspiracy as additional punishment/retaliation for the Connecticut incident" (*id.* at ¶ 38), he has not provided <u>any facts</u> that suggest that any of the Moving Defendants entered into an agreement with one another, Dr. DeFilippo, and/or the Connecticut

officials to place him the MCU as additional punishment for the May 21, 2006 assault.  As such, the Court dismisses without prejudice the conspiracy claim under § 1983 and the NJCRA as to the Moving Defendants.

### c.   Due Process Claims

In Count II of the Second Amended Complaint, Plaintiff alleges that it was the "policy" of the Moving Defendants "to conduct sham MCU Review Hearings to substantiate [the] illegal lock in of Plaintiff in [the] MCU."  The Court construes Plaintiff to allege that the Moving Defendants, acting in their personal supervisory capacities, violated Plaintiff's due process rights under the Fourteenth Amendment and the NJCRA.

In analyzing a procedural due process claim, the first step is to determine whether the nature of the interest is one within the contemplation of the "liberty or property" language of the Fourteenth Amendment. *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000) (citing *Fuentes v. Shevin*, 407 U.S. 67 (1972)).  Once the court determines that the interest asserted is protected by the Due Process Clause, the question then becomes what process is due to protect it.  *Id* (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).  A liberty interest is created when a prison's action imposes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).  When considering whether an inmate's placement in segregated housing triggers a legally cognizable interest courts consider: (1) the amount of time spent in segregation; and (2) whether the conditions of segregation were significantly more restrictive than those imposed on other inmates in segregation. *Shoats*, 213 F.3d at 144 (citing *Sandin*, 515 U.S. at 486).  Here, Plaintiff alleges that he was housed in the MCU for more than six years and that the conditions of his confinement also violate the Eighth Amendment.  The more than six-year duration of his confinement coupled

with the conditions he alleges in the MCU appear to state an atypical and significant hardship that implicates a liberty interest. *See, e.g., Allah v. Bartkowski*, 574 F. App'x 135, 139 (3d Cir. 2014) (finding six-year confinement under similar conditions stated a liberty interest).

Where a liberty interest is implicated, the next inquiry under the Fourteen Amendment focuses on whether a plaintiff was provided with the process he was due. In the context of placement in segregated housing, due process includes a meaningful opportunity to respond and be heard at the initial MCU placement hearing, at the routine reviews every 90 days, and at the annual reviews. *See Allah*, 574 F. App'x at 139. For example, the Third Circuit found that the plaintiff in *Allah v Bartkowski* had adequately

> alleged a litany of defects during [his MCU review] hearings that violated his due process rights. Primarily, Allah alleged that several of his administrative appeals were ignored; that members of the MCU RC were unfamiliar with and often violated, *inter alia*, Sections 10A:5–2.3 to .5 of the New Jersey Administrative Code governing MCU RC proceedings; that MCU RC hearings were perfunctory and without substance; that at least one MCU RC member, Dr. Flora DeFillipo, was unaware that she was an MCU RC member; that Dr. DeFillipo signed off on MCU RC decisions without realizing she had done so; and that Dr. DeFillipo never engaged in factfinding or weighing of the evidence.

*Id.* at 139-40. (finding that Allah had stated Fourteenth Amendment claims that should not have been dismissed at screening for failure to state a claim) (citing *City of W. Covina v. Perkins*, 525 U.S. 234, 239 (1999) (holding that due process requirements include a meaningful opportunity to be heard) and *Sourbeer v. Robinson*, 791 F.2d 1094, 1101 (3d Cir.1986)).

Here, however, Plaintiff's Second Amended Complaint does not provide sufficient facts to suggest that he was denied due process in his MCU placement hearing or subsequent hearings. By way of background, the MCU at NJSP is a close custody unit to which inmates are assigned if they pose a substantial threat (1) to the safety of others, (2) of damage to or destruction of property, or (3) of interrupting the operation of a state correctional facility. *See* N.J. Admin.

Code § 10A:5–1.3, 10A:5–2.5. An inmate is assigned to the MCU based upon a determination

made by the MCURC.  N.J. Admin. Code § 10A:5–2.5.[4]  A formal review of each inmate placed

in MCU must be made every three months by the MCURC. N.J. Admin. Code § 10A:5–2.10(a).

At each review hearing, the MCURC "shall again review the information upon which the

decision was based to assign the inmate to the MCU." N.J. Admin. Code § 10A:5–2.10(e).

Further, the NJDOC is to conduct a hearing at least once a year to determine whether an inmate's

release from MCU would be appropriate.[5] N.J. Admin. Code § 10A:5–2.11(a).

　　　With respect to his initial placement in the MCU in 2008, Plaintiff argues only that he

was not given the L.C. Criteria Board sheet within 24 hours of his prehearing placement in the

MCU (Second Amended Compl. at ¶ 29), and that he was not given a hearing within 10 days of

his prehearing placement in the MCU  (*Id.* at ¶ 30.)  As noted by the Moving Defendants, at the

---

[4] A number of criteria are considered by the MCURC when making this determination, including, *inter alia*, (1) the inmate's disciplinary records, (2) past criminal offenses, (3) the number and location of past institutionalizations, (4) reports by professional staff, (5) reports indicating present involvement in criminal activity in the community or within the correctional facility, (6) evidence of an attitude indicating an unwillingness to follow rules and obey orders, (7) inability to maintain a satisfactory work record as indicated in reports by work supervisors or frequency of job changes, (8) information indicating unsatisfactory adjustment to, or performance in, treatment or rehabilitative programs, and (9) evidence of the inability or unwillingness to house with other inmates in a nondisruptive and nondestructive manner.  N.J. Admin. Code § 10A:5–2.4.

[5] At this annual hearing, the inmate has the initial burden of showing that the inmate should be released from MCU.  Evidence thereof includes (1) participation in required programs, jobs, educational, and recreational programs, (2) compliance with criteria detailed by the MCURC, (3) no participation in certain prohibited acts for a year, and (4) agreement to reaffirm the obligation to adhere to prison rules and regulations for inmate behavior. N.J. Admin. Code § 10A:5–2.11(b).  The NJDOC then has the burden of putting forth substantial evidence, "including behavior, correctional facility adjustment, and disciplinary history that the inmate continues to pose an identifiable threat: (1) to the safety of others; (2) of damage to, or destruction of property; or (3) of interrupting the secure and/or orderly operation of a State correctional facility." N.J. Admin. Code § 10A:5–2.11(c).

time of Plaintiff's initial placement in the MCU, he may not have been held in the MCU long enough to trigger the protections of the due process clause, and, in any event, these defects appear to have been cured when he was given the required notice on March 3, 2008 and received his hearing on March 10, 2008.   Although Plaintiff states in his Second Amended Complaint that after the hearing, the MCURC committee allegedly ordered him to remain in the MCU "without just cause" (*Id.* at ¶ 32), this allegation is conclusory and provides no facts to support that he was denied due process in his initial placement hearing.

With respect to his subsequent routine and annual review hearings, Plaintiff alleges that the MCURC "conducted seventeen (17) routine reviews held every three months[,] and[] six annual reviews held once a year[,]" and did not release him despite a lack of violations on Plaintiff's part.  (*Id.* at ¶ 46.)  Plaintiff, however, has not alleged that he was denied the opportunity to respond or be heard in any of his hearings; nor does he argue that the prison authorities failed to consider favorable information or provide any <u>facts</u> suggesting that prison officials dealt with his case in a perfunctory fashion.

Instead, to support his claim, he alleges (1) that the documentation supporting his more than six year confinement in the MCU references only the May 21, 2006 assault, for which he had already completed an administrative segregation program in Connecticut, and (2) that he committed no new infractions while housed in the MCU at NJSP. (Second Am. Compl. at ¶¶ 42-43, 46.)   At best, Plaintiff's factual allegations suggest that the decisions to place and keep him confined in the MCU were based on his prior assault of a corrections official in Connecticut.[6]  It

---

[6] The Court notes that in *Shoats v. Horn*, 213 F.3d 140, 146 (3d Cir. 2000), the Third Circuit held that, absent defects in the process provided, confinement in administrative custody based solely on prior crimes would pass constitutional muster because "predictions of likely future behavior based on a generally volatile criminal character have been upheld by the Supreme Court[.]"   The court further noted that "[i]n the volatile atmosphere of a prison, an inmate easily may constitute

is clear that Plaintiff disagrees with the decisions of the MCURC and believes that he should have been placed in the general population at NJSP because he had already served 19 months in administrative segregation in Connecticut as "punishment" for the May 21, 2006 assault and because Connecticut prison officials allegedly promised that he would be returned to the general population upon completion of the administrative segregation program in Connecticut.  Due process, however, does not require prison officials to reach a particular result; rather, the analysis focuses on whether Plaintiff received <u>fair procedures</u>.  Although Plaintiff states in a conclusory manner that Defendants had a policy of conducting sham and perfunctory review hearings, his Second Amended Complaint provides no facts about the process – or lack of process – afforded to him in his initial placement hearing or the subsequent hearings.  To state a due process violation under the Fourteenth Amendment or under the NJCRA, Plaintiff would need to <u>allege specific facts</u> suggesting that there were serious defects in the procedure afforded to him.  *See, e.g., Allah*, 574 F. App'x at 139-40.

Plaintiff's Second Amended Complaint likewise fails to state a supervisory liability claim against the Moving Defendants based on their alleged "policy" of conducting or tolerating sham MCU review hearings.  The requirements for personal supervisory liability under the Eighth Amendment were recently clarified by the Third Circuit in *Barkes v. First Correctional Medical,*

---

an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents.  The judgment of prison officials in this context, like that of those making parole decisions, turns largely on purely subjective evaluations and on predictions of future behavior."  *Id.* (citing *Hewitt v. Helms*, 459 U.S. 460, 474 (1983) (internal citations omitted)).  Thus, so long as he received due process, Plaintiff could conceivably be held in administrative custody merely because his admitted assault of the prison guard in Connecticut reasonably predicted future misconduct at NJSP.

*Inc.*, 766 F.3d 307, 316-19 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 135 S.

Ct. 2042, 2043 (2015). There, the Third Circuit outlined "two general ways" in which a

supervisor-defendant may be liable under the Eighth Amendment: (1) where the supervisor

established a policy, custom, or practice that caused the harm; or (2) where the supervisor

personally participated in the constitutional violation. The Third Circuit explained these two

general types of supervisory liability as follows:

> [f]irst, liability may attach if they, "with deliberate indifference to
> the consequences, established and maintained a policy, practice or
> custom which directly caused [the] constitutional harm." *A.M. ex
> rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586
> (3d Cir. 2004) (alteration in original) (quoting *Stoneking v.
> Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)).
> Second, "a supervisor may be personally liable under § 1983 if he
> or she participated in violating the plaintiff's rights, directed others
> to violate them, or, as the person in charge, had knowledge of and
> acquiesced" in the subordinate's unconstitutional conduct. *Id.*
> (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190–91 (3d Cir.
> 1995)). "Failure to" claims – failure to train, failure to discipline,
> or, as in the case here, failure to supervise – are generally
> considered a subcategory of policy or practice liability.

*Id.*

Here, Plaintiff's Second Amended Complaint alleges that Defendant Barnes was the

former chair and hearing officer of the MCURC, but provides no facts regarding Defendant

Barnes' participation in the initial placement or review decisions. Instead, Plaintiff alleges

generally that the Moving Defendants had a "policy" of conducting or tolerating sham and/or

perfunctory MCU review hearings. In *Barkes*, the Third Circuit reaffirmed its four-part standard,

established in *Sample v. Diecks*, for determining whether an official may be held liable on a §

1983 Eighth Amendment claim for implementing deficient policies. *See Barkes* at 317 (citing

*Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989)). Under *Sample*,

> [t]o hold a supervisor liable for such an Eighth Amendment
> violation, the plaintiff must identify a supervisory policy or

19

> procedure that the supervisor defendant failed to implement, and
> prove that: (1) the policy or procedures in effect at the time of the
> alleged injury created an unreasonable risk of a constitutional
> violation; (2) the defendant-official was aware that the policy
> created an unreasonable risk; (3) the defendant was indifferent to
> that risk; and (4) the constitutional injury was caused by the failure
> to implement the supervisory procedure.

*Barkes*, 766 F.3d at 330.  As explained in *Barkes*, "[t]he essence of the type of claim [the court]

approved in *Sample* is that a state official, by virtue of his or her own deliberate indifference to

known deficiencies in a government policy or procedure, has allowed to develop an environment

where there is an unreasonable risk that a constitutional injury will occur, and that such an injury

does occur."  766 F.3d at 319-20.  Deliberate indifference in the supervisory context may be

demonstrated by "(i) showing that a supervisor failed to adequately respond to a pattern of past

occurrences of injuries like the plaintiff['s] or (ii) by showing that the risk of constitutionally

cognizable harm was 'so great and so obvious that the risk and the failure of supervisory officials

to respond will alone' support the finding that the two-part test is met." *Beers–Capitol v.

Whetzel*, 256 F.3d 120, 136–37 (3d Cir. 2001) (emphasis added) (citing *Sample*, 885 F.2d at

1099).

Here, Plaintiff has simply alleged in a conclusory fashion that the Moving Defendants

had a policy of conducting sham MCU review hearings and had personal knowledge of or

involvement in the violations of Plaintiff's constitutional rights.  As noted above, however, he

does not provide facts describing the constitutional deficiencies in the MCU review hearing

process; nor does he provide facts from which the Court could find that Defendants Lanigan,

Warren, Ricci, or Barnes were on notice of those deficiencies.[7]

---

[7] As noted above, Plaintiff's provides facts alleging that Defendant Barnes was the former chair
and hearing officer of the MCURC, but he does not provide sufficient facts showing that there
were deficiencies in the hearings conducted by the MCURC.

For these reasons, the Court will dismiss without prejudice Plaintiff's procedural due process claims under the Fourteenth Amendment and the NJCRA as to the Moving Defendants.

### d. Conditions of Confinement Claims

In Count III of the Second Amended Complaint, Plaintiff alleges that the conditions of his confinement in the MCU violate the Eighth Amendment and the NJCRA.  The Eighth Amendment imposes upon prison officials a duty to provide "'humane conditions of confinement.'" *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 256 (3d Cir. 2010) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). "For the conditions of confinement to rise to the level of an Eighth Amendment violation, they must deny the "'minimal civilized measure of life's necessities." ' " *Id.* (quoting *Farmer*, 511 U.S. at 835).  Unsanitary conditions can be cruel and unusual. *Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir.1992), *superseded by statute*, Prison Litigation Reform Act of 1996, Pub.L. No. 104–134, 110 Stat. 1321, as recognized in *Nyhuis v. Reno*, 204 F.3d 65, 71 n. 7 (3d Cir. 2000).  To establish deliberate indifference a prison official must both know of and disregard an excessive risk to an inmate's health or safety.  Thus, "[t]o assert an Eighth Amendment conditions of confinement claim, a prisoner must satisfy both an objective ('Was the deprivation sufficiently serious?') and subjective ('Did the officials act with a sufficiently culpable state of mind?') test." *Allah*, 574 F. App'x at 138 (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

The Moving Defendants argue that Plaintiff's Second Amended Complaint "is devoid of allegations from which one could reasonably infer that any of the [Moving] Defendants were aware of the existence of the specific conditions that he claims violated his Eighth Amendment rights, much less that they drew the inference that these conditions created a substantial risk of serious harm to him and [that they] deliberately disregarded the same."  (ECF No. 27-4, Moving

Br. at page 28.)  Indeed, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable.  *Sutton v. Rasheed*, 323 F.3d 236, 249 (3d Cir. 2003) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207–08 (3d Cir. 1988)).  Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. *Rode*, 845 F.2d at 1207–08; *see also Atkinson v. Taylor*, 316 F.3d 257 (3d Cir. 2003).  A plaintiff can, however, prove an official's actual knowledge of a substantial risk to his safety "in the usual ways, including inference from circumstantial evidence." *Farmer v. Brennan*, 511 U.S. 825, 842–43 (1994)(explaining that if an Eighth Amendment plaintiff presents evidence showing that a substantial risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.").

At the end of Count III, Plaintiff alleges as follows with respect to his Eighth Amendment and NJCRA claims regarding his conditions of confinement:  "Defendants were in fact notified of these risks and[] the injuries Plaintiff has already suffered due to this ongoing confinement."  This allegation and the general allegations regarding Defendants' knowledge in Count IV are conclusory at best, but they are not the only allegations from which the Court could infer that certain of the Moving Defendants had knowledge of the alleged Eighth Amendment and NJCRA violations.  Notably, Plaintiff describes the extreme cold and heat in the MCU as "a long historical documented MCU issue."  (*Id.* at ¶ 58.)  Defendant Warren is identified by Plaintiff as "the former Administrator of NJSP" who "was charged with the day to day operations of [NJSP]" during the relevant time periods. (*Id.* at ¶ 12.)  Defendant Ricci is identified by Plaintiff

as "Director of Operations, and Former Administrator of [NJSP,]" [who was] "responsible for overseeing, maintaining, enforcing and enacting policies[,] customs[,] and practices governing the [MCU.]"  (*Id.* at ¶ 13.)   At this early stage, the allegations (1) that the extreme temperature issues in the MCU were longstanding and (2) that Defendants Warren and Ricci were, at the relevant times, administrators at NJSP who were responsible for prison operations, are sufficient to infer that Defendants Warren and Ricci were exposed to information regarding the alleged Eighth Amendment and NJCRA violations related to the extreme temperatures, which condition, of course, relates to the operation of the prison.  The Court will therefore deny the motion to dismiss the Eighth Amendment and NJCRA claims related to the extreme temperatures as to Defendants Warren and Ricci.   In contrast, there are no facts in the Second Amended Complaint from which the Court could infer that Defendant Lanigan, who is identified in the Complaint as the Commissioner of the NJDOC, and Defendant Barnes, who is identified in the Complaint as a hearing officer for the MCURC, would have had notice of the extreme temperature conditions in the MCU, even if the issues were longstanding.

Furthermore, Plaintiff does not provide sufficient facts from which the Court could infer that any of the Moving Defendants were on notice of the other remaining alleged violations of his Eighth Amendment rights as described in the Second Amended Complaint.  Plaintiff alleges that he was placed in a cell block [in the MCU] where special needs prisoners were banging on the cells all day and night or screaming out loudly[.]"  (*Id.* at ¶ 62.)  These prisoners allegedly "yelled all night, banged or yelled in unison for hours, and [at] all hours of the night," and allegedly prevented Plaintiff from sleeping. (*Id.* at ¶ 63.)  Plaintiff also alleges that these prisoners did not wash themselves, leading to unsanitary conditions in the common areas of the MCU and to an infestation of mice in Plaintiff's cell.  (*Id.* at ¶¶ 64-65.)  Finally, Plaintiff alleges

that the toilet in his cell had months of feces built up in it and would not flush.   (*Id.* at ¶ 52.) Assuming, without deciding, that these condition presented a serious risk to Plaintiff's health and/or safety, Plaintiff does not provide facts from which the Court could infer that Defendants Lanigan, Warren, Ricci, or Barnes knew of and disregarded any of these risks.  Instead, he simply states in a conclusory fashion that all the Defendants were on notice of the alleged conditions and acted with deliberate indifference to the risk.[8]

For the reasons stated above, the Court will deny the motion to dismiss the Eighth Amendment and NJCRA claims related to the extreme temperatures in the MCU as to Defendants Warren and Ricci.  The claims related to the extreme temperatures in the MCU are dismissed without prejudice as to Defendants Lanigan and Barnes.  The Court will grant the motion to dismiss without prejudice with respect to Plaintiff's remaining conditions of confinement claims under the Eighth Amendment and the NJCRA as to all Moving Defendants.

### c.   Qualified Immunity

The Moving Defendants have also raise the defense of qualified immunity.  The Court addresses qualified immunity only with respect to Defendants Ricci and Warren and the surviving Eighth Amendment claim regarding extreme temperatures in the MCU.  The Moving

---

[8] The Court notes that Plaintiff also alleges that he was wrongfully "stigmatize[d]" as a special needs prisoner and was allegedly stripped of his clothing and placed on suicide watch when he first arrived in the M.C.U in 2008; he further alleges that an officer was placed in front of his cell 24 hours a day, and he was watched even when he was using the bathroom." (*Id.* at ¶¶ 49-51.) He likewise does not provide any facts to suggest that any of the Moving Defendants ordered Plaintiff to be placed on suicide watch or knew that he had been placed on suicide watch.  In any event, allegations concerning Plaintiff's placement suicide watch do not state any facts that, if proven, would show that he was denied one of life's minimal necessities. "At most, the facts that [Plaintiff] did plead allow the potential inference that he suffered or perceived inconvenience, discomfort, and stigma" due to his placement on suicide watch, which is not sufficient to state an Eighth Amendment claim for relief. *See Smith v. Bolava*, 632 F. App'x 683, 687 (3d Cir. 2015), *cert. denied*, 136 S. Ct. 2019, 195 L. Ed. 2d 226 (2016)

Defendants argue generally that they are entitled to qualified immunity on Plaintiff's Eighth

Amendment claims because (1) the facts as alleged in the Second Amended Complaint do not

establish a constitutional violation, and (2) even if the facts establish a constitutional violation,

Plaintiff's rights were not clearly established at the time of the violation.  (*See* ECF No. 27-4,

Moving Br. at 29-33.)  The Court has already determined that Plaintiff has alleged sufficient

facts from the Court could infer that Defendants Ricci and Warren were on notice of the

allegedly extreme temperatures in the MCU.  The Moving Defendants fail to provide any

specific legal support for their arguments that extreme temperatures cannot violate the Eighth

Amendment or that Plaintiff's Eighth Amendment rights were not clearly established at the time

of the alleged violations.  As such, they have not met their initial burden to show that they are

entitled to qualified immunity.

  Moreover, in *Wilson v. Seiter*, 501 U.S. 294, 304 (1991), the Supreme Court of the

United States stated, albeit in dicta, that "a low cell temperature at night combined with a failure

to issue blankets" could state a claim under the Eighth Amendment.  Circuit courts that have

considered the issue have found that "the right of a prisoner not to be confined in a cell at so low

a temperature as to cause severe discomfort and in conditions lacking basic sanitation" is well

established under the Eighth Amendment.  *See Chandler v. Baird*, 926 F.2d 1057, 1065–66 (11th

Cir. 1991) (collecting circuit court cases); *Lewis v. Lane*, 816 F.2d 1165, 1171 (7th Cir. 1987)

("An allegation of inadequate heating may state an eighth amendment violation."); *Ramos v.

Lamm*, 639 F.2d 559, 568 (10th Cir.1980) ("a state must provide ... reasonably adequate

ventilation, sanitation, bedding, hygienic materials, and utilities (i.e., hot and cold water, light,

heat, plumbing)") (citations omitted), *cert. denied*, 450 U.S. 1041 (1981).[9] A survey of the opinions from various Circuit Courts of Appeals reveals that other courts have also recognized that a prison official's failure to provide relief from extremely high temperatures may constitute an Eighth Amendment violation. *See Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) ("[I]t is well settled that exposing prisoners to extreme temperatures without adequate ventilation may violate the Eighth Amendment."); *Graves v. Arpaio*, 623 F.3d 1043, 1049 (9th Cir. 2010) ("The district court did not err ... in concluding that dangerously high temperatures that pose a significant risk to detainee health violate the Eighth Amendment."); *In Jones El v. Berge*, 374 F.3d 541, 543-45 (7th Cir. 2004) (affirming a district court's enforcement order requiring air-conditioning of plaintiffs' cells during summer heat waves following "the plaintiffs assert[ions] that they were subjected to extreme temperatures in violation of the Eighth Amendment."); *Chandler v. Crosby*, 379 F.3d 1278, 1294 (11th Cir.2004) ( "[T]he Eighth Amendment applies to prisoner claims of inadequate cooling and ventilation.").

For the reasons explained above, the Court will deny the motion to dismiss the Eighth Amendment and NJCRA claims on qualified immunity grounds as to Defendants Ricci and Warren at this time.

---

[9] Our own Court of Appeals has not directly addressed the issue in a published opinion, but has questioned, in an unpublished opinion, whether an inmate's exposure to freezing temperatures runs afoul of the Eighth Amendment, even when the inmate's cell "was so cold that it caused pain in his legs." *See Burkholder v. Newton*, 116 F. App'x 358, 363 (3d Cir. 2004). There, however, the Third Circuit denied a conditions of confinement claim based on exposure to cold temperatures and an unsanitary toilet for 30 days. *See id.* Here, however, Plaintiff alleges that he was exposed to freezing temperatures for a much longer period of time than the period considered by the Third Circuit in *Burkholder*, and, as a result of the extreme cold, suffered "severe and chronic aching in his legs" and was placed on "chronic care status" at NJSP. (*See* Second Am. Compl. at ¶¶ 53-59.)

## V.     <u>CONCLUSION</u>

For the reasons explained in this Opinion, Defendants' motion to dismiss is granted in part and denied in part.  The Court will dismiss with prejudice the official capacity claims for damages against the Moving Defendants.  The official capacity claims for declaratory relief are dismissed without prejudice as to the Moving Defendants.  Plaintiff's conspiracy claim under § 1983 and the NJCRA is dismissed without prejudice as to the Moving Defendants.  Plaintiff's procedural due process claims under the Fourteenth Amendment and the NJCRA are dismissed without prejudice as to the Moving Defendants.  The Court will deny the motion to dismiss the Eighth Amendment and NJCRA claims related to extreme temperatures in the MCU as to Defendants Warren and Ricci.  The claims related to the extreme temperatures in the MCU are dismissed without prejudice as to Defendants Lanigan and Barnes. Plaintiff's remaining conditions of confinement claims under the Eighth Amendment and the NJCRA are dismissed without prejudice as to all Moving Defendants.  With respect to the claims that the Court has dismissed without prejudice, Plaintiff may submit a Third Amended Complaint within 45 days that cures the deficiencies in those claims.  An appropriate Order follows.


<u>/s/ Freda L. Wolfson</u>
Freda L. Wolfson
United States District Judge


Date: September 26, 2016