**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

ODE OBATAIYE,                                  :
                                               :
                    Plaintiff,                 :          Civ. No. 14-5462 (FLW) (TJB)
                                               :
          v.                                   :
                                               :
GARY LANIGAN et al.,                           :          **OPINION**
                                               :
                    Defendants.                :
_____ :

**FREDA L. WOLFSON, U.S.D.J.**

## I.      INTRODUCTION

Plaintiff, Ode Obataiye ("Obataiye"), is a state prisoner, presently incarcerated at East

Jersey State Prison, in Rahway, New Jersey.  He is proceeding _pro se_ with a Fourth Amended

Complaint, asserting claims under 42 U.S.C. § 1983.  (ECF No. 47.)  Presently before the Court

is a motion by defendants, Gary Lanigan ("Lanigan"), Charles E. Warren ("Warren"), Jimmy

Barnes ("Barnes"), Michelle Ricci ("Ricci"), and Dr. Flora DeFilippo ("DeFilippo")

(collectively, "Defendants"), seeking dismissal of the Fourth Amended Complaint under Federal

Rule of Civil Procedure 12(b)(6).  (ECF No. 51.)  For the following reasons, the motion is

granted in part and denied in part.

## II.      BACKGROUND AND PROCEDURAL HISTORY

### A.  Underlying Circumstances

As the facts underlying this case are included in detail in the Court's Opinion resolving

Defendants' motion to dismiss the Second Amended Complaint, (ECF No. 28), only the most

relevant facts are repeated here.  Obataiye is serving a sentence imposed by the Connecticut state

court. (ECF No. 47 ¶ 1.) After being charged with assaulting a guard in a Connecticut prison, Obataiye was administratively transferred to New Jersey State Prison ("NJSP") on January 17, 2008. (*Id.* ¶¶ 11–14.) Upon his arrival at NJSP, Obataiye was assigned to the Management Control Unit ("MCU"),[1] and he was initially placed on close observation, which apparently involved constant observation and the confiscation of his shoes. (*Id.* ¶¶ 15–23.) Despite his efforts to be reassigned to the general population of the prison via quarterly and annual reviews, Obataiye remained in the MCU for six and a half years, until he was finally reassigned to the general population in August or September 2014. (*Id.* ¶¶ 79–87.)

**B. Commencement and Removals of the Action**

Obataiye originally commenced this action on February 1, 2013, by filing a Verified Complaint with the Superior Court of New Jersey, Mercer County, Law Division. (Notice of Removal, Ex. A, Ver. Compl., ECF No. 1-1, at ECF pp. 5–36.) That Verified Complaint alleged claims under the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment, as well as provisions of the New Jersey Constitution. His claims relate to his past assignment to the MCU, his initial close observation, and the temperature and unsanitary conditions of his cell. (*See id.*) That case was removed to this Court, *Obataiye v. Lanigan*, Civ. No. 13-4323 (FLW) (TJB), but, after Obataiye was granted leave to file an amended pleading that omitted his federal claims, the action was remanded to Superior Court. *See* Civ. No. 13-4323, Order, ECF No. 23.

Once back in state court, Obataiye filed a new amended pleading that reasserted federal claims, and Defendants again removed the action to this Court, on September 3, 2014. (*See* ECF

---

[1] The MCU at NJSP is a close custody unit to which inmates are assigned if they pose a substantial threat (1) to the safety of others, (2) of damage to or destruction of property, or (3) of interrupting the operation of a state correctional facility. *See* N.J. Admin. Code § 10A:5-1.3; N.J. Admin. Code tit. 10a, ch. 5, subch. 2.

No. 1.)  The operative complaint at that time ("the First Amended Complaint")[2] alleged due-process violations, namely that all of Obataiye's reviews as to potential release from the MCU "were no more than perfunctory sham hearings"; that he did not timely receive relevant paperwork; and cruel and unusual punishment by way of close observation, temperature extremes, and unsanitary conditions in his cell.  (*See* Notice of Removal, Ex. N, Am. Compl., ECF No. 1-2, at ECF pp. 70–95.)  The First Amended Complaint specifically alleged that DeFilippo, who was a voting member of the MCU review committee ("MCURC"), had admitted in a separate civil action that she did not examine the facts or evidence in any case and signed MCURC decisions without realizing what they were.  (*Id.* ¶¶ 19–26.)

### C.  The Second Amended Complaint and Corresponding Dismissal Motion

In response to a motion by Defendants to dismiss his claims, Obataiye sought leave to file a Second Amended Complaint, which the Court granted.  (*See* ECF Nos. 14, 17, & 22.)  The Second Amended Complaint was largely based on the same circumstances previously complained of and asserted four counts against Defendants in their personal and official capacities and various John Doe defendants.  (*See* 2d Am. Compl., ECF No. 23.)  Count One alleged a conspiracy by Defendants to violate Obataiye's rights by failing give him "written notice" or to "comply with the requirements of L.C. 36 Criteria Board Sheet" within 24 hours of his placement in MCU, and failing to give him a timely hearing until more than 50 days after his placement in MCU, instead of 10 as he alleged was required.  (*Id.* ¶¶ 27–30.)  He further asserted that Defendants had violated his rights by placing and maintaining him in the MCU for six and a

---

[2]  The Court notes that this was at least the third pleading Obataiye had filed during all underlying proceedings, but the first operative pleading under this docket number.  Nonetheless, it will refer to this as the First Amended Complaint, and will number successive pleadings accordingly, consistent with the parties' references to the various pleadings.

half years, when he had already spent 19 months in administrative segregation in a Connecticut prison for his assault on a guard and had not subsequently been in trouble. (*Id.* ¶¶ 32–40.)

Count Two alleged that Defendants had violated Obataiye's due-process rights by maintaining him in MCU despite his prior punishment and no new infractions. (*Id.* ¶¶ 42–46.) Obataiye alleged that the MCURC held 17 "routine reviews" and six "annual reviews," but that these "sham and perfunctory hearings" violated his rights. (*Id.*)

In Count Three, Obataiye alleged that Defendants had subjected him to cruel and unusual punishment by keeping him in the unsanitary and hazardous conditions of the MCU for six and a half years. (*Id.* ¶¶ 48–68.) He alleged that he was initially subjected to "close observation," which involved being watched by a corrections officer outside his cell 24 hours a day; Obataiye claims that such observations resulted in humiliation and stigmatization. (*Id.* ¶¶ 49–51.) In addition, Obataiye explained that the toilet in his cell was covered in feces, that conditions in the M.C.U. were generally very unsanitary, that his cell and the surrounding areas were consequently infested with rodents, and that he could not get cleaning supplies because he was on close observation. (*Id.* ¶¶ 52, 64–66.) Moreover, he alleged that his cell was "extremely cold" or "freezing cold," as it was winter, and there was vent blowing in cold air; in that connection, Obataiye claimed that he was given only one pair of underwear, one shirt, and one pair of pants, with no shoes or socks, and without "proper" blankets or bedding. (*Id.* ¶¶ 53–54.) Obataiye represented that the temperature "was an ongoing issue" (also characterizing it as "a long historical documented M.C.U. issue"), that he filed grievances regarding it, and that Defendants did not fix the temperature or provide blankets. (*Id.* ¶¶ 55–58.) He insisted that these conditions resulted in various health problems, including headaches, difficulty breathing, exhaustion, a "dried and bloody nose," and hypertension. (*Id.* ¶¶ 59–61, 66.) Obataiye also

alleged that other MCU inmates' constant screaming and banging caused him continual stress and psychiatric problems.  (*Id.* ¶¶ 62–63, 67.)

Count Four alleged supervisory liability against Defendants, arguing that they created a policy or custom that led to the violation of his constitutional rights, had knowledge of his situation, and were deliberately indifferent to his harm.  (*Id.* ¶¶ 70–80.)

Defendants moved to dismiss the Second Amended Complaint on a variety of bases under Federal Rule of Civil Procedure 12(b)(6).  (Mot., ECF No. 27.)  They argued that the claims against them in their official capacities warranted dismissal because they, in their official capacities, are not "persons" for the purposes of § 1983.  (Br. in Supp., ECF No. 27-4, at 6–11.) They argued that the claims against Lanigan, Warren, Barnes, and Ricci should be dismissed for failure to show sufficient personal involvement to establish supervisory liability.  (*Id.* at 11–15.) Defendants contended that the Second Amended Complaint had failed to plead sufficient facts supporting a claim of conspiracy and that Obataiye admitted that he had received an initial hearing regarding his assignment to MCU, as well as periodic reviews.  (*Id.* at 16–26.)  They further argued that the Eighth Amendment claims should be dismissed as Obataiye had not shown that Defendants were deliberately indifferent to his conditions of confinement.  (*Id.* at 26–29.)  Defendants argued that the claims must be dismissed under the doctrine of qualified immunity, as their actions were constitutional and as there was no clearly established law that they were not.  (*Id.* at 29–33.)  Finally, they asserted that the applicable statute of limitations barred any claim that accrued before February 1, 2011.  (*Id.* at 33–35.)  Obataiye filed no opposition to the motion.

On September 26, 2016, the Court issued an Opinion and Order that granted in part and denied in part the motion.  (ECF Nos. 28 & 29.)  The Court dismissed with prejudice Obataiye's

claims against Defendants in their official capacities, finding that they would not be considered persons for the purposes of § 1983, and the Court dismissed without prejudice Obataiye's demands for declaratory relief, noting that declaratory judgment cannot be granted solely as to past conduct. (ECF No. 28 at 10–12.) Finding that Obataiye failed to plead facts showing any agreement between defendants, the Court dismissed his conspiracy claim without prejudice. (*Id.* at 12–14.)

Addressing Obataiye's due-process claims, the Court found that his "more than six-year duration of his confinement coupled with the conditions he alleges in the MCU appear to state an atypical and significant hardship that implicates a liberty interest." (*Id.* at 14–15.) Nevertheless, the Court dismissed the due process claims without prejudice, finding that the Second Amended Complaint failed to plead facts sufficiently supporting the claim that Obataiye did not receive sufficient due process by being placed or maintained in the MCU. (*Id.* at 15–18.) The Court found that when Obataiye allegedly did not timely receive paperwork or an initial hearing, he had not been in the MCU long enough to trigger due-process protections and, in any case, those defects were cured by the initial review he subsequently received. (*Id.* at 16–17.) As to the alleged due-process issues with subsequent reviews, the Court found that Obataiye "has not alleged that he was denied the opportunity to respond or be heard in any of his hearings; nor does he argue that the prison authorities failed to consider favorable information or provide any <u>facts</u> suggesting that prison officials dealt with his case in a perfunctory fashion." (*Id.* at 17.) The Court emphasized that due process revolves around whether a person received fair procedures, not particular results. (*Id.* at 18.) The Court also dismissed Obataiye's related claims for supervisory liability, finding the claims of supervisory knowledge of and deliberate indifference to a policy of sham reviews to be conclusory. (*Id.* at 18–20.)

The Court found Obataiye's allegation that Defendants were on notice of the conditions of his confinement to be generally conclusory, but held that he had adequately alleged that problems with extreme heat and cold were sufficiently long running to put Warren and Ricci, both of whom were allegedly in charge of prison operations, on notice. (*Id.* at 22–23.) Accordingly, the Court permitted the Eighth Amendment claims for extreme temperatures to proceed against Warren and Ricci, but dismissed those claim as against the other defendants, as Obataiye alleged no facts showing the remaining defendants should have had notice of the problem. (*Id.* at 23.) The Court dismissed the remainder of the Eighth Amendment claims finding that Obataiye had not alleged facts showing notice of the other conditions to Defendants. (*Id.* at 23–24.)

The Court declined to find that the surviving Eighth Amendment claims against Warren and Ricci were barred by the doctrine of qualified immunity, as the allegation of deliberate indifference to extreme temperatures had stated a potential constitutional violation and as opinions from the Supreme Court and various Courts of Appeals had recognized that a prisoner's constitutional rights may be violated by subjection to extreme temperatures. (*Id.* at 24–26.) The Court granted Obataiye leave to submit, within 45 days, a Third Amended Complaint addressing the claims dismissed without prejudice. (*Id.* at 27.)

**D. The Third and Fourth Amended Complaints**

Shortly thereafter, Obataiye filed a motion seeking summary judgment for the extreme-temperature claims against Warren and Ricci, (ECF No. 33), and he subsequently filed a Third Amended Complaint alleging exclusively due-process violations, (ECF No. 34). Defendants asked the Court to deny the motion for summary judgment and moved to dismiss the Third Amended Complaint. (ECF Nos. 35 & 40.) The Court then denied summary judgment as moot,

denied Defendants' dismissal motion, and permitted Obataiye "one final opportunity" to file an all-inclusive Fourth Amended Complaint. (ECF Nos. 45 & 46.)

Obataiye then filed his Fourth Amended Complaint, which is the operative pleading in this action. (ECF No. 47.) While completely reformatted, the substantive allegations included in the Fourth Amended Complaint are largely the same as those included in the Second Amended Complaint, though Obataiye no longer alleges a conspiracy claim. (*See id.*) The Court will focus primarily on Obataiye's new allegations.

As in his Second Amended Complaint, Obataiye alleges that he was consistently subjected to extreme cold in the winter, while provided only a shirt and pants and, initially, no bedding, as well as extreme heat in the summer, causing various health problems. (*Id.* ¶¶ 25–43, 171–179.) He again alleges that his initial cell was "disgusting" and that he was denied cleaning supplies until he received an initial MCU hearing two months later. (*Id.* ¶¶ 44–67.) Obataiye also now alleges that for the first 19 months he was at NJSP, although considered to be "on MCU," he was not housed in the MCU unit, meaning that instead of frequent outdoor exercise, he was only permitted to go outside twice a month, "alone in a dog kennel." (*Id.* ¶¶ 75–78.)

Obataiye newly complains of an incident when, while exercising in a "kennel," he passed out and collapsed (perhaps in relation to his hypertension and anemia.) (*Id.* ¶¶ 94–101.) He alleges that he was prescribed a regimen of cortisone shots to treat weakness or atrophy in his legs caused by lack of exercise, but that these shots were then discontinued. (*Id.* ¶¶ 102–103.) He alleges that he "complained and filed numerous remedies using the prisons Inmate Remedy System," and that, though he was initially told he would be seen by the prison medical director, he never was. (*Id.* ¶¶ 104–106.) Obataiye alleges that he filed an appeal which was "eventually denied at the final level." (*Id.* ¶¶ 106–107.)

In regards to his due-process claims, Obataiye alleges that he completed required programs intended to facilitate release from the MCU to the general population, but that, despite this, the MCURC declined to release him until August or September 2014. (*Id.* ¶¶ 68–74, 79–85.) Obataiye again alleges that the MCURC's initial decision to place him in the MCU and the subsequent reviews violated his due-process rights. (*Id.* ¶¶ 120–164.) He bases this primarily on the fact that DeFilippo participated in his initial hearing and on DeFilippo's alleged admissions in a 2009 deposition that "she never reviewed a single report (ie. evidence) regarding any inmate's hearing, never asked or answered a single question regarding any inmate's placement hearing, nor had she ever participated in any decision to place or release an inmate from the MCU Housing Unit." (*Id.* ¶¶ 90–92, 126–132.)

Obataiye alleges that his subsequent review hearings suffered from the same defects, and were "mere formalities that generally lasted no more than a minute or two," though he asserts that "at each and every one" of the review hearings he "would inform the committee that he was in compliance with NJAC 10A:5-2.10 & NJAC 10A:5-2.11, and thus should be released from the MCU unit." (*Id.* ¶¶ 137–139.) He specifically contends that DeFilippo did not review any information for either his initial or his subsequent review hearings, and he argues that no MCURC member ever presented evidence suggesting he was a threat so as to justify keeping him in the MCU. (*Id.* ¶¶ 141–149.)

Obataiye further alleges that he always told Barnes, the chairperson of the MCURC, that he was in compliance with applicable rules, but that "[t]here was never any dialog between Plaintiff and ChairPerson Barnes about the information and evidence favorable to the Plaintiff" and that Barnes "treated the hearing in a perfunctory manner . . . by reciting the same statement he ended every hearing with, "you will hear from the committee soon." (*Id.* ¶¶ 150–153.) He

further alleges that Barnes violated his rights by allowing MCURC members to sign decisions to keep Obataiye in MCU "despite knowing that the members (DeFillipo in particular) had not reviewed any evidence nor casted [sic] a vote." (*Id.* ¶¶ 133–136, 154.) Obataiye also asserts that after the review hearings, he filed appeals to Warren, then the prison administrator, "that almost always went unanswered." (*Id.* ¶¶ 93, 156.)

### E. The Present Motion to Dismiss

Presently before the Court is Defendants' motion to dismiss the Fourth Amended Complaint. (ECF No. 51.) Defendants' arguments are largely the same as those they raised in their motion to dismiss the Second Amended Complaint. (*See* Br. in Supp., ECF No. 51-1.) They first argue that the applicable statute of limitations bars claims regarding all injuries that occurred before February 1, 2011, or two years before Obataiye filed his initial complaint. (*Id.* at 8–10.) For the first time, Defendants contend that Obataiye failed to exhaust administrative remedies before filing this action. (*Id.* at 10–11.) The claims against Lanigan, Warren, Barnes, and Ricci must be dismissed, Defendants argue, as the Fourth Amended Complaint does not allege personal involvement by them in the alleged violations. (*Id.* at 11–17.) They reason that the due-process claims against Barnes are premised explicitly on a theory of *respondeat superior* and that Obataiye has not made specific allegations to show that Ricci or Warren knew of the extreme temperature problems and other conditions of confinement. (*Id.* at 15–16, 26–30.) Defendants also maintain that Obataiye has not properly alleged that the temperature conditions presented a risk to health and safety or identified what the actual temperature was, instead simply describing it as unpleasant. (*Id.* at 28–29.)

Defendants insist that Obataiye's due-process claims concern the initial MCU determination in 2008, too soon for a liberty interest to have accrued, and that Obataiye

"concedes that he was given the 32 routine and 6 annual reviews to which he was entitled." (*Id.* at 17–22.) They argue that, even if testimony from DeFilippo's 2009 deposition could invalidate Obataiye's prior hearings, she also indicated that she subsequently corrected her participation, thus only supporting attacks on the earlier hearings. (*Id.* at 24–26.)

Finally, Defendants assert that they are shielded from liability by qualified immunity. (*Id.* at 30–39.) They contend that no cases clearly establish that the process Obataiye received in review hearings after 2009 violated due process. (*Id.* at 35–36.) Defendants argue that the allegations regarding sanitary problems in the MCU are "far too vague to either violate the Plaintiff's Eighth Amendment Rights, or to form a basis by which the court could determine whether the law was clearly established with regard to those specific conditions." (*Id.* at 36–37.) They again insist that Obataiye's allegations as to extreme temperatures are not sufficiently specific to support an Eighth Amendment claim or to determine whether precedential cases are applicable. (*Id.* at 37–38.) Defendants argue that the cases concerning extreme temperatures previously cited by the Court "may indeed stand for the general proposition that under the right circumstances, temperature extremes can violate the Eighth Amendment," but they assert that these cases do not show that Obataiye's specific circumstances constituted a clearly established rights violation. (*Id.* at 38–39.)

Obataiye filed no opposition to this motion.

## III.    ANALYSIS

### A.  Dismissal Standard Under Rule 12(b)(6)

In resolving a motion to dismiss under Rule 12(b)(6), "'courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled

to relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)); *see also Zimmerman v. Corbett*, 873 F.3d 414, 417–18 (3d Cir. 2017); *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010).  In other words, a complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 308 n.3 (3d Cir. 2014).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  In addition to the allegations of the complaint, a court may consider matters of public record, documents specifically referenced in or attached to the complaint, and documents integral to the allegations raised in the complaint. *Mele v. Fed. Reserve Bank of N.Y.*, 359 F.3d 251, 255 n.5 (3d Cir. 2004).

*Pro se* pleadings, as always, will be liberally construed. *See Haines v. Kerner,* 404 U.S. 519, 520 (1972); *Glunk v. Noone*, 689 F. App'x 137, 139 (3d Cir. 2017).  Nevertheless, "pro se litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013).

### B.  Claims Under 42 U.S.C. § 1983

As a general matter, a plaintiff may have a cause of action under 42 U.S.C. § 1983 for certain violations of constitutional rights.  That section provides,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction

> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress, except that in any action brought against a
> judicial officer for an act or omission taken in such officer's
> judicial capacity, injunctive relief shall not be granted unless a
> declaratory decree was violated or declaratory relief was
> unavailable.

42 U.S.C. § 1983.  To state a claim under § 1983, a plaintiff must allege the violation of a right

secured by the Constitution or laws of the United States and that the alleged deprivation was

committed or caused by a person acting under color of state law.  *See Harvey v. Plains Twp.*

*Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011); *see also West v. Atkins*, 487 U.S. 42, 48 (1988).[3]

### C. Due Process Claims

The first step in assessing a procedural due-process claim is to determine whether the

alleged injury implicates a "liberty or property" interest under the language of the Fourteenth

Amendment. *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000) (citing *Fuentes v. Shevin*, 407

U.S. 67 (1972)).  Once the court determines that the interest asserted is protected by the Due

Process Clause, the question then becomes what process is due to protect it.  *Id.* (citing

*Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).  In its prior Opinion, the Court found that

Obataiye's allegations in his Second Amended Complaint concerning his confinement to the

MCU for over six years "state an atypical and significant hardship that implicates a liberty

interest."  (ECF No. 28 at 14–15.)  As Obataiye raises the same issues in his Fourth Amended

---

[3]  To the extent that Plaintiff raises claims under the New Jersey Civil Rights Act mirroring his §
1983 claims, they will be addressed in tandem with his federal causes of action. *See Trafton v.
City of Woodbury*, 799 F.Supp.2d 417, 443–44 (D.N.J. 2011); *see also Armstrong v. Sherman*,
Civ. No. 09–716, 2010 WL 2483911, at *5 (D.N.J. Jun. 4, 2010) ("[T]he New Jersey Civil
Rights Act is a kind of analog to section 1983."); *Chapman v. New Jersey*, Civ. No. 08–4130
(AET), 2009 WL 2634888, at *3 (D.N.J. Aug. 25, 2009) ("Courts have repeatedly construed the
NJCRA in terms nearly identical to its federal counterpart . . . .").

Complaint and Defendants do not contest the point, the Court sees no reason to revisit that analysis.

Where a liberty interest is implicated, the next inquiry under the Fourteenth Amendment focuses on whether a plaintiff was provided with the process he was due. In the context of this case, due process includes a meaningful opportunity to respond and be heard at the initial MCU placement hearing, at each routine review, and at each annual review. *See Allah v. Bartkowski*, 574 F. App'x 135, 139 (3d Cir. 2014). For example, the Third Circuit found that the plaintiff in *Allah v Bartkowski* had adequately

> alleged a litany of defects during [his MCU review] hearings that violated his due process rights. Primarily, Allah alleged that several of his administrative appeals were ignored; that members of the MCU RC were unfamiliar with and often violated, *inter alia*, Sections 10A:5–2.3 to .5 of the New Jersey Administrative Code governing MCU RC proceedings; that MCU RC hearings were perfunctory and without substance; that at least one MCU RC member, Dr. Flora DeFillipo, was unaware that she was an MCU RC member; that Dr. DeFillipo signed off on MCU RC decisions without realizing she had done so; and that Dr. DeFillipo never engaged in factfinding or weighing of the evidence.

*Id.* at 139–40 (finding that Allah had stated Fourteenth Amendment claims that should not have been dismissed at screening for failure to state a claim); *see also City of W. Covina v. Perkins*, 525 U.S. 234, 239 (1999); *Sourbeer v. Robinson*, 791 F.2d 1094, 1101 (3d Cir.1986)).

In its prior Opinion, the Court found that Obataiye had not sufficiently pleaded facts showing that he was denied due process during the initial decision to place him in MCU or during subsequent review hearings.[4] (ECF No. 28 at 15–21.) Construing the *pro se* plaintiff's

---

[4] As the Court noted then, an inmate is assigned to the MCU based upon a determination made by the MCURC. N.J. Admin. Code § 10A:5–2.5. A formal review of each inmate placed in MCU must occur before the MCURC every three months. N.J. Admin. Code § 10A:5–2.10(a). At each review hearing, the MCURC "shall again review the information upon which the decision was based to assign the inmate to the MCU." N.J. Admin. Code § 10A:5–2.10(e).

Fourth Amended Complaint liberally, the Court reads it as alleging that, in connection with Obataiye's initial MCURC hearing, DeFilippo did not review any reports or evidence, asked no questions, and did not participate in the decision to assign Obataiye to the MCU, despite being a member of the committee. (*See* ECF No. 47 ¶¶ 128–132.) Obataiye alleges that Barnes should be liable for permitting the hearing to take place while knowing that DeFilippo was not meaningfully participating. (*Id.* ¶¶ 133–136.) The Court further construes the Fourth Amended Complaint as alleging that these defects continued during each subsequent review. (*See id.* ¶¶ 137–138, 143–144, 148–149, 154.) Obataiye also contends that he filed administrative appeals to then-Administrator Warren "that almost always went unanswered." (*Id.* ¶¶ 93, 156.)

Obataiye seemingly admits that he had opportunities to respond and be heard at his various reviews before the MCURC. (*See id.* ¶¶ 139, 150–151, 153.) Nevertheless, the Court finds that Obataiye has alleged facts sufficient to support a due-process claim, at least against DeFilippo, Barnes, and Warren. Like the plaintiff in *Allah*, Obataiye alleges that DeFilippo did not consider any facts or evidence or otherwise participate in MCURC decisions to place or maintain him in the MCU, despite signing such decisions. *See Allah*, 574 F. App'x at 140. Obataiye also alleges, like Allah, that most of his appeals of MCURC decisions were ignored. *See id.* at 139–40. Given the similarities between Obataiye's claims and those in *Allah*, complete dismissal of the due-process claims is not warranted.

Contrary to Defendants' argument that Obataiye's due-process claim against Barnes is premised explicitly on *respondeat superior*, the Fourth Amended Complaint, liberally construed, alleges facts sufficient to support a claim for supervisory liability against Barnes. The Third

Additionally, the Department of Corrections is to conduct a hearing at least once a year to determine whether an inmate's release from MCU would be appropriate. N.J. Admin. Code § 10A:5–2.11(a).

Circuit has noted that supervisory liability requires personal involvement by the supervisor, which may include when a supervisor has knowledge of unconstitutional conduct and acquiesces in it. *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *rev'd on other grounds by Taylor v. Barkes*, 135 S. Ct. 2042 (2015); *A.M. ex rel. J.M.K. v. Luzerne Cty. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). Obataiye alleges that Barnes, as chair of the MCURC, permitted decisions to go forward without DeFilippo's participation and that he knowingly accepted the signature of DeFilippo or other committee members on such decisions "despite knowing that [they] had not reviewed any evidence nor casted [sic] a vote." (ECF No. 47 ¶¶ 134–136, 153–155.) The Fourth Amended Complaint thus alleges not a theory of pure *respondeat superior*, but instead knowledge of, and acquiescence to, violations of Obataiye's constitutional rights.

Furthermore, the Court rejects Defendants' argument that Obataiye's claims must be dismissed because he has not pleaded exhaustion of administrative remedies. (*See* ECF No. 51-1 at 10–11.) The requirement of the Prisoner Litigation Reform Act that prisoners exhaust administrative remedies before filing a § 1983 claim creates an affirmative defense to be pleaded by the defendant—not an element required to be pleaded by the plaintiff. *See Jones v. Bock*, 549 U.S. 199, 211–17 (2007); *see also Ray v. Kertes*, 285 F.3d 287, 291–95 (3d Cir. 2002). Accordingly, whether Obataiye pleaded exhaustion of administrative remedies is irrelevant to the analysis on this motion under Rule 12(b)(6): whether the Fourth Amended Complaint states a claim.

Defendants' argument that, following the 2009 deposition, DeFilippo changed her practices and began actively participating in MCURC decisions is an improper attempt to argue the facts on this motion to dismiss. (*See* ECF No. 51-1 at 24–26.) DeFilippo's testimony regarding her changed behavior may be relevant at some stage of this case, but it is not on this

motion, when the Court must accept Obataiye's factual allegations as true.  *See Fowler*, 578 F.3d at 210.  Because Defendants also base their argument regarding qualified immunity to the due process claims on DeFilippo's changed behavior, this argument also fails. (*See* ECF No. 51-1 at 35–36 ("The State Defendants are aware of no cases that establish that the procedure accorded Plaintiff after the reforms that occurred after DeFilippo's June, 2009 deposition, violated his rights.")).

Obataiye's due-process claims will be limited, however, by the applicable statute of limitations.  Claims under § 1983 are subject to New Jersey's two-year statute of limitations for personal-injury claims.  *See Patyrak v. Apgar*, 511 F. App'x 193, 195 (3d Cir. 2013) (citing *Dique v. N.J. State Police*, 603 F.3d 181, 185 (3d Cir. 2010)); *Evans v. Gloucester Twp.*, 124 F. Supp. 3d 340, 349 (D.N.J. 2015) (citing *Pittman v. Metuchen Police Dep't*, 441 F. App'x 826, 828 (3d Cir. 2011)).  The accrual of a cause of action is a matter of federal law and generally coincides with the time that the plaintiff knew or should have known of the alleged injury.  *See Kach v. Hose*, 589 F.3d 626, 634–35 (3d Cir. 2009).

Obataiye alleges that his due-process rights were violated at each hearing held before the MCURC.  There is no indication that Obataiye did not or should not have known of the alleged injury at the time of each review, and accordingly, his claims will be considered to have accrued at the time of each review when he was assigned to or maintained in the MCU.  Defendants argue that Obataiye's claims must be limited to those that accrued on or after February 1, 2011, which is two years before he filed his original complaint raising these allegations.  (*See* ECF No. 51-1 at 8–10.)  The Court agrees, and finds that allegations of Obataiye's due-process claims pertaining to Defendants' actions or inactions that occurred before February 1, 2011, are dismissed as untimely.

Finally, the Fourth Amended Complaint does not appear to assert due-process claims against any defendant other than DeFilippo, Barnes, and Warren; but, to the extent they are asserted against Lanigan and Ricci, those claims are dismissed.

### D. Eighth Amendment Claims

As explained in the Court's prior Opinion, the Eighth Amendment requires that prison officials provide humane conditions of confinement. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 256 (3d Cir. 2010); *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "For the conditions of confinement to rise to the level of an Eighth Amendment violation, they must deny the 'minimal civilized measure of life's necessities.'" *Betts*, 621 F.3d at 256 (quoting *Farmer*, 511 U.S. at 835). Unsanitary conditions can be cruel and unusual. *Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir.1992), *superseded by statute*, Prison Litigation Reform Act of 1996, Pub. L. No. 104–134, 110 Stat. 1321. To establish deliberate indifference a prison official must both know of and disregard an excessive risk to an inmate's health or safety. *See Farmer*, 511 U.S. at 837. Thus, "[t]o assert an Eighth Amendment conditions of confinement claim, a prisoner must satisfy both an objective ('Was the deprivation sufficiently serious?') and subjective ('Did the officials act with a sufficiently culpable state of mind?') test." *Allah*, 574 F. App'x at 138 (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

The Court previously concluded that Obataiye's general allegations that Defendants had notice of his conditions of confinement were conclusory, but found that he had alleged that the temperature extremes were sufficiently ongoing and documented to support a claim that the former prison administrators, Warren and Ricci, were deliberately indifferent to the problem. (*See* ECF No. 28 at 22–24.) This Court held that as the administrators, Warren and Ricci were

assumed to have knowledge of prison conditions, such as the allegedly extreme temperatures in Plaintiff's prison cell. The Fourth Amended Complaint does not change this analysis. As to the remaining defendants, Obataiye again alleges that the temperature problems are longstanding and that he and other inmates had complained about the problem "over the years." (ECF No. 47 ¶¶ 30–31, 39–41, 172–174.) He does not, however, allege facts that could show those defendants had notice of the alleged unsanitary conditions or other problems, but rather, simply stating in a conclusory fashion that "Defendants were in fact notified of these risks and, the injuries plaintiff has already suffered due to this ongoing confinement." (*See id.* ¶¶ 187, 197.) Obataiye suggests that those defendants knew of his conditions because of progress reports transmitted to the Connecticut prison system, but does not allege that such progress reports would have discussed his conditions of confinement or identify who allegedly prepared or received these reports. (*See id.* ¶¶ 192–193, 199, 201.) Accordingly, any Eight Amendment claims will again be dismissed against all defendants except for the Eight Amendment claims related to extreme temperatures against Warren and Ricci.

In that regard, the Court rejects Defendants' argument that Obataiye's allegations regarding the extreme temperatures are insufficiently specific to establish a risk to health and safety. Defendants contend that Obataiye "tells us nothing more than that the temperature he was exposed to was something he personally found unpleasant," and they complain that he does not specify the actual temperatures to which he was subjected. (ECF No. 51-1 at 28–29.) Contrary to this assertion, Obataiye alleges that, during the winter, his cell was "freezing," that "the vent in the Plaintiff's cell was blowing extremely hard and the air coming out of the vent was freezing cold," and that he was provided only with a shirt and pants, initially receiving no bedding. (ECF No. 47 ¶¶ 24–31, 171–172, 174.) Obataiye claims that his subjection to these

temperatures caused him to suffer ongoing muscle and joint pain, as well as sleep deprivation. (*Id.* ¶¶ 31–37, 176.)  He also alleges that, during the summer, the vent in his cell blew hot air and caused him to suffer "excessively hot temperatures."  (*Id.* ¶¶ 40–41, 176–177.)  He asserts that this heat caused him headaches, breathing problems, a "constant dried and bloody nose," and exhaustion.  (*Id.* ¶ 42.)

Obataiye thus alleges considerably more than that he was subjected to temperatures that were uncomfortable, instead claiming that they caused him a wide variety of health problems. That Obataiye did not allege that he was exposed to any particular temperature—assuming he was not provided with a thermometer—is not fatal to his claim.  At the pleading stage, Plaintiff need not allege the temperature with such specificity.

Finally, Defendants argue that the Eighth Amendment claim related to temperature extremes should be dismissed on the basis of qualified immunity.  (*See* ECF No. 51-1 at 37–39.) Qualified immunity is 'an entitlement not to stand trial or face the burdens of litigation.'" *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  Under this doctrine, a government official is immune from claims for damages unless, interpreting the allegations most favorably to the plaintiff, they show (1) that the official violated the plaintiff's constitutional rights and (2) that the constitutional right violated was clearly established.  *Id.* at 201; *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("[G]overnment officials performing discretionary functions . . . are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.").  A right is considered clearly established if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and

alterations omitted); *see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). A right is thus clearly established where existing precedent has "'placed the statutory or constitutional question beyond debate.'" *Taylor*, 135 S. Ct. at 2044 (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011)).

In its prior Opinion, the Court noted that the Supreme Court had stated in dictum that "a low cell temperature at night combined with a failure to issue blankets" may amount to a violation of Eighth Amendment rights. *See Wilson*, 501 U.S. at 304. It noted opinions from Courts of Appeal recognizing "'the right of a prisoner not to be confined in a cell at so low a temperature as to cause severe discomfort,'" (ECF No. 28 at 25 (quoting *Chandler v. Baird*, 926 F.2d 1057, 1065–66 (11th Cir. 1991) (collecting appellate cases))), and also various cases finding potential Eighth Amendment violations from exposure to high temperatures, (*id.* at 26).

Defendants argue that these cases only "stand for the general proposition that under the right circumstances, temperature extremes can violate the Eighth Amendment," comparing these cases to the Supreme Court's holding in *Mullenix v. Luna*, 136 S. Ct. 305 (2015). (ECF No. 51-1 at 38.) In that case the Court of Appeals for the Fifth Circuit had rejected an argument of qualified immunity, finding that "the law was clearly established such that a reasonable officer would have known that the use of deadly force, absent a sufficiently substantial and immediate threat, violated the Fourth Amendment." *Mullenix*, 136 S. Ct. at 308. The Supreme Court reversed, finding this principle not sufficiently specific to clearly establish that an officer's shooting at an intoxicated fugitive who was engaged in a high-speed car chase and who had made threats of violence against other officers could violate the fugitive's constitutional rights. *Id.* at 308–12.

Defendants' comparison is inapt. The Court perceives very little similarity between the rejected-analysis of the Fifth Circuit in *Mullenix* (applying the principle that the propriety of using deadly force depends upon a substantial and immediate threat to a case involving an officer's shooting at a fugitive in a high-speed chase) and the analysis in this Court's prior Opinion (applying precedent identifying potential Eighth Amendment violations where prisoners are subjected to extreme cold or extreme hot to a case where a prisoner alleges subjection to extreme temperatures). Defendants argue that Obataiye's allegations regarding temperature are not sufficiently specific to draw comparisons to other cases; but, even if there are some variation in the details between those published decisions and this case, the Supreme Court has noted that the clearly established prong "'do[es] not require a case directly on point.'" *Taylor*, 135 S. Ct. at 2044 (quoting *Al-Kidd*, 563 U.S. at 741).

Like his due-process claims, however, Obataiye's Eighth Amendment claims are also limited by the statute of limitations. Accordingly, any recovery will be limited to conditions of confinement on or after February 1, 2011.

The Court additionally notes that it might be possible to construe Obataiye's allegations regarding his collapse while exercising and related medical treatment as an attempt to assert a claim for deliberate indifference to a serious medical need. (*See* ECF No. 47 ¶¶ 94–109.) To the extent that Obataiye indeed seeks to assert such a claim, it will be dismissed as an unpermitted amendment under Federal Rule of Civil Procedure 15. Obataiye's leave to amend was limited to efforts to cure deficiencies in the claims that were previously dismissed by the Court—it did not permit him to add any new claims he desired. (*See* ECF No. 28 at 27; ECF No. 46 ¶ 7.)

## IV.    CONCLUSION

For the foregoing reasons, the pending, unopposed dismissal motion is granted in part and denied in part, insofar as described herein.  To the extent that Obataiye asserts due-process claims against Lanigan and Ricci, such claims are dismissed for failure to state a claim against those defendants.  Furthermore, Obataiye's due-process claims insofar as they seek recovery based on injuries that occurred before February 1, 2011 are dismissed with prejudice as barred by the applicable statute of limitations.  Obataiye's due-process claims against Warren, Barnes, and DeFilippo that accrued on or after February 1, 2011 shall be permitted to proceed.  To the extent that Obataiye asserts Eighth Amendment claims against Lanigan, Barnes, and DeFilippo, such claims are dismissed for failure to state a claim against those defendants.  Any Eighth Amendment claims pertaining to conditions other than extreme temperatures are dismissed for failure to state a claim, and the Eighth Amendment claims are dismissed with prejudice insofar as they concern injuries occurring before February 1, 2011.  The extreme-temperature claims against Warren and Ricci that accrued on or after February 1, 2011 shall be permitted to proceed.

An appropriate order follows.


DATED:  June 18, 2018                                    /s/ Freda L. Wolfson
                                                        FREDA L. WOLFSON
                                                        United States District Judge